UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

JAMES DAVIS,                                              No. 22 Civ. _____

                              Plaintiff,                 COMPLAINT AND
                                                         JURY TRIAL DEMAND

        v.

CITY OF NEW YORK,
DETECTIVE MATTHEW HUTCHISON (tax no. 905454),
DETECTIVE EDWARD VASQUEZ (tax no. 896762)
DETECTIVE "LARRY" EGGERS (tax no. 877552),
DETECTIVE "JOHN" WHELAN, SERGEANT "JOHN"
McCORMACK, "JOHN/JANE DOE" NYPD
Detectives ##1-10,

                              Defendants.
------------------------------------------------------X

        Plaintiff JAMES DAVIS ("Plaintiff"), by his attorneys, ROMANO & KUAN, PLLC

complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

                              **NATURE OF ACTION**

        1.      This is a civil rights action, pursuant to 42 U.S.C. §§1983 and 1988, United States

Constitution, and state law, seeking monetary damages for Plaintiff, JAMES DAVIS, due to his

wrongful prosecution, conviction, and imprisonment for a murder that he did not commit.

Plaintiff's injuries were caused by the pervasive misconduct and the wrongful policies and

practices of the Kings County District Attorney's Office ("KCDAO") and the New York City

Police Department ("NYPD"), and their individual employees.

        2.      Plaintiff spent more than 17 years in local and state custody, before and after his

trial and conviction in 2006, until his conviction was reversed by the Appellate Division, Second

Department, and the indictment later dismissed on August 3, 2021 by the New York State

Supreme Court, Kings County, Justice Matthew Demic, on motion by the Kings County District Attorney's Office.

3.     This lawsuit seeks to hold Defendant CITY OF NEW YORK liable for the above misconduct under the federal civil rights statute, 42 U.S.C. §1983, and *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).  The unlawful actions of police detectives and prosecutors resulted from affirmative or *de facto* municipal policies, practices, and customs that violated the constitutional rights of criminal suspects and defendants or from deliberate indifference by policy-making officials, acting on behalf of Defendant CITY OF NEW YORK, to such violations. Both the NYPD and the KCDAO, as a matter of policy, manufactured false or unreliable testimony through the use of suggestive questioning techniques and identification procedures, unlawfully concealed exculpatory or impeachment evidence known as "*Brady*" material, and lied to or misled courts, defense attorneys, and criminal defendants in order to cover up their unlawful behavior.  In the rare case where such misconduct was exposed, these agencies took no disciplinary action against the offending employees, but instead praised and promoted them, thereby encouraging future constitutional violations to occur, including those that were committed against Plaintiff.

4.      Additionally, and equally as important, this lawsuit seeks to hold the individual police officers and detectives from the New York City Police Department whose wrongful and unconstitutional conduct was the direct and proximate cause of Plaintiff's injuries.

### JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

5.     This action arises under 42 U.S.C. §§1983 and 1988, the United States Constitution, and under the common law of the State of New York.

6. Jurisdiction is conferred on this Court by 28 U.S.C. §§1331 and 1343, and by principles of pendent jurisdiction.

7. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

8. On or about October 31, 2021, Plaintiff served upon Defendant CITY OF NEW YORK timely notice of the present claims pursuant to New York General Municipal Law §§50-e. A hearing pursuant to New York General Municipal Law §50-h was held on May 6, 2022.

9. This action has been commenced within one year and 90 days of the accrual of Plaintiff's causes of action.

10. Plaintiff has duly complied with all the conditions precedent to the commencement of this action.

## THE PARTIES

11. Plaintiff JAMES DAVIS, is a citizen of the Unites States, and currently resides within the State of Pennsylvania.

12. Defendant CITY OF NEW YORK ("CITY") is a municipal corporation, fully organized and existing under and by virtue of the laws of the State of New York and is a resident of the Eastern District of New York.

13. Defendant MATTHEW HUTCHISON, tax reg no. 905454, was at all relevant times a 75th Precinct detective employed by the New York City Police Department ("NYPD"), acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and official capacities.

14. Defendant EDWARD VASQUEZ, tax reg no. 896762, was at all relevant times a 75th Precinct detective employed by the New York City Police Department ("NYPD"), acted

toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

15.     Defendant "Larry" EGGERS, tax reg no. 877552, was at all relevant times a 75th Precinct detective employed by the New York City Police Department ("NYPD"), acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

16.     Defendant "John" WHELEN, was at all relevant times a 75th Precinct detective employed by the New York City Police Department ("NYPD"), acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

17.     Defendant "John" McCORMACK, was at all relevant times a 75th Precinct sergeant employed by the New York City Police Department ("NYPD"), acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment.  He is sued in his individual and official capacities.

18.     Defendants "JOHN/JANE DOE" NYPD Detectives and Officers #1-10, all of whose names are known to the CITY and the NYPD, were at all relevant times detectives and officers employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the CITY OF NEW WORK, and acted within the scope of their employment.  They are sued in their individual and official capacities.

19.     The NYPD is an agency of the CITY OF NEW YORK. Detectives and officers employed by the NYPD are agents and employees of the CITY, which is legally responsible for torts they commit within the scope of their employment and/or under the color of law.

20.     Defendants HUTCHISON, VASQUEZ, EGGERS, WHELAN, McCORMACK, and "JOHN/JANE DOE" NYPD Detectives and Officers ##1-10 will be referred to collectively as the "INDIVIDUAL DEFENDANTS."

<u>**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**</u>

<u>**The Incident and Police Investigation**</u>

21.     A large party with about 250 attendees was held on Saturday night, January 24-25, 2004, in the Prince Hall Masonic Temple, at 70 Pennsylvania Avenue, in Brooklyn. There was dancing and a bar.

22.     Twenty-one year old Blake Harper went to the party with several friends and family members.

23.     Twenty-one year old JAMES DAVIS also attended the party, along with several friends from his neighborhood, to celebrate his younger brother Daniel Davis' birthday. The friends included Jamel Black, Junior Watkins, and Corey Hinds.

24.     Although the party was supposed to end at 4:00 a.m., DAVIS decided to leave early because he had too much to drink and was throwing up in the bathroom. DAVIS called his girlfriend, Kaneen Johnson, at around 2:30 a.m. to tell her that he was leaving the party and to meet him outside her house on Hancock Street. Daniel and Jamel accompanied him outside while he hailed a cab.

25.     DAVIS reached Kaneen Johnson's home shortly after 2:30 a.m. Ms. Johnson described DAVIS as "drunk and stupid" when he got out of the cab and threw up on the street.

26.     Kaneen and DAVIS walked 4-5 blocks to her aunt's house on Herkimer Street where they spent the night.

27.     After DAVIS left the party, Daniel and Jamel went back inside to the party.

28.     At around 3 a.m., an argument broke out between Jamel and Jamel's brother, Nathaniel Black, and two men who snatched a bottle of Moet Champagne from Nathaniel's hands. Jamel described the two men as "a black guy and a Spanish guy." One of the party promoters broke up the argument and offered to replace the bottle.

29.     Shortly before the party was scheduled to end, Jamel was at the coat check when someone behind him said, "you thought it was over." Jamel turned and felt a pain in his right backside and stomach and realized he had been stabbed by the same black guy he argued with earlier. After stabbing Jamel, the black guy walked away, heading towards the back of the club.

30.     In a great deal of pain, Jamel started walking towards the bathroom to search for his brother when he ran into Tagy "Tay" Hall, who he knew from the neighborhood. Tay lived on the same block as Jamel's grandmother.

31.     Jamel had seen Tay earlier that night at the bar and smoked with him.

32.     Jamel told Tay what happened, and Tay said he would take him to the hospital. As they were heading to the exit, Tay said, "oh shit," and then pushed Jamel onto the ground. Jamel heard six rapid shots. When he looked up, he saw Tay putting a small gun in his pocket.

33.     Tay helped Jamel off the floor and said he had to go before the police came.

34.     Jamel looked to see who got shot and saw it was the black man who he had argued with earlier, lying on the floor bleeding with a knife next to him.

35.     Jamel managed to get himself outside the club and found Daniel Davis and their friend Junior Watkins. Daniel and Junior helped bring Jamel to Daniel's grandmother's home where they called an ambulance.

36.     Jamel was taken to Kings County Hospital, where he underwent two surgeries and received 27 staples in his stomach.

The Police Investigation

37.     Blake Harper, the black male that Jamel saw lying on the floor bleeding, died at the scene.

38.     A man named Eddie Thomas was shot in the buttocks. And another man named Alexander Shannon was stabbed. They were both treated at Brookdale Hospital.

39.     Detective MATTHEW HUTCHISON from the 75th Precinct homicide squad was assigned as the lead detective.

40.     Party goers who were still at the Masonic Temple when the police arrived were rounded up and taken to the 75th Precinct to be interviewed.

41.     Witnesses described a chaotic scene of people screaming, running, and pushing when shots rang out.

42.     At 6:00 a.m., on January 25th, Detective Welch (tax no. 886709) interviewed one of Blake Harper's friends, Arturo Kerr. Kerr described an argument between a Spanish guy and a black male and another black male with braids shooting into the crowd killing his friend "Mel" (aka Blake Harper).

43.     At 8:00 a.m., Detective Roland Gray (tax no. 897599) interviewed another of Blake Harper's friends, Shawn Belton, who stated that he heard shots fired and tried to leave

through the back exit, but the door was locked. He then proceeded to the front door and saw his friend on the floor. According to Belton's narrative, he did not see the shooting or the shooter.

44.     Nathaniel Black, Jamel Black's younger brother, was one of the party goers that the police brought to the 75th Precinct to be interviewed. While at the precinct, Nathaniel called home and spoke to his sister, Tina Black. He told Tina that Jamel had been stabbed at the club and that he was at Kings County Hospital. When she asked whether Jamel was okay and asked why Jamel got stabbed, Nathaniel said he didn't know, couldn't talk about it right now and hung up.

45.     Detectives HUTCHISON and VASQUEZ attempted to interview Jamel Black at Kings County Hospital at 9:00 a.m., but he was sedated and unable to be interviewed.

46.     At 9:30 a.m., Detective VASQUEZ called Tina Black, who he knew was not a witness and was not at the Masonic Temple party.

47.     Tina Black, who was JAMES DAVIS's childhood sweetheart, was still in love with DAVIS and angry at him for having another girlfriend.

48.     Tina relayed the conversation she had with Nathaniel to Detective VASQUEZ, which VASQUEZ documented in a DD5, and then she added a lie -- that JAMES DAVIS was the shooter.

49.     Detective VASQUEZ knew that Tina Black could not possibly know who committed the shooting, since she was not at the party at the Masonic Temple. Indeed, Detective VASQUEZ did not even write in the DD5 that Tina had named DAVIS.

50.     Detectives interviewed Alexander Shannon and Eddie Thomas at Brookdale Hospital, but they were unable to provide any information about the shooter.

51.     At 8:35 p.m., Detectives EGGERS and HUTCHISON interviewed another of Blake Harper's friends, David Torres, who described an argument between Harper and two black males and described a third light skinned black male, about 18 years old, as the shooter. According to HUTCHISON's DD5 of the interview, Torres stated, "I think that dude had braids," referring to the shooter.

52.     Pursuant to NYPD investigative procedures, detectives ran the names of the victims and potential witnesses in their state and federal "bad guy" databases such as the High Intensity Drug Trafficking Area (H.I.D.T.A.), Computer Assisted Robbery System (CARS), and SARRS/ORION for gang affiliations. Several of the victims and witnesses had prior arrests for drugs, robberies, and weapons charges.

53.     None of the eyewitnesses who the detectives interviewed on day one knew the light skinned black male with braids.

54.     Notwithstanding, by day two, January 26, 2004, the INDIVIDUAL DEFENDANTS inexplicably, and with no credible evidence that he was involved in the shooting, started pursuing JAMES DAVIS as their suspect.

55.     At 11:00 a.m. on January 26th, Detective EGGERS conducted a tenant search for JAMES and Daniel DAVIS and found that they lived with their grandmother Dora Davis in the Ocean Hill Houses.

56.     Detectives HUTCHISON and VASQUEZ put together a suggestive photo array containing DAVIS's arrest photo from two years prior, when he wore his hair in cornrows, to show to witnesses. None of the other photos in the array looked like DAVIS's photo.

57.     Indeed, DAVIS's appearance on January 25th was very different from the photo the detectives put in the array, because he no longer wore his hair in cornrows and he had aged two years.

58.     On January 25, 2004, DAVIS's hair was short in a low-cut Caesar style with waves. He did not have braids.

59.     The INDIVIDUAL DEFENDANTS knew or should have known that DAVIS had short hair in a low-cut Caesar style on the date of the incident and did not match the description witnesses provided of the shooter.

60.     Between Jamel Black's first and second surgeries, while at the hospital, two of the INDIVIDUAL DEFENDANTS returned to Kings County Hospital and interviewed him. Jamel told them that the black male [Harper] who was shot and killed was the person who stabbed him and that "Tay" shot [Harper] while defending him.

61.     Inexplicably, Detective HUTCHISON and the other INDIVIDUAL DEFENDANTS did not pursue the information provided to them by Jamel Black about the actual shooter.

62.     The INDIVIDUAL DEFENDANTS either intentionally failed to document Jamel Black's interview in a DD5 or in their memo books, or withheld or destroyed any documentation of his statement.

63.     The INDIVIDUAL DEFENDANTS either intentionally failed to document Jamel Black's interview in a DD5 or in their memo books, or withheld or destroyed any documentation of his statement naming "Tay" as the shooter, because that statement undermined the case they were building against JAMES DAVIS.

64.     As a result of their failure to document Jamel Black's statement, or their withholding or destruction of his statement, Jamel's statement that "Tay" committed the shooting was never turned over to prosecutors at the KCDAO and Mr. DAVIS, which was a violation of their constitution duty under *Brady v. Maryland*.

65.     Detective HUTCHISON and the INDIVIDUAL DEFENDANTS intentionally failed to show the photo array containing JAMES DAVIS's photo to Jamel Black and did not ask Jamel whether JAMES DAVIS was involved in the shooting, because they knew he would undermine the case that they were building against him.

66.     On the evening of February 4, 2004, Blake Harper's brother-in-law, Jose Machicote (aka "Pappa" or "Pappo"), one of the most notorious and violent drug dealers in Brownsville, Brooklyn, appeared at the 75th Precinct to be interviewed by Detectives HUTCHISON and VASQUEZ. None of the other witnesses had previously mentioned Machicote.

67.     Upon information and belief, Detectives HUTCHISON and VASQUEZ and the other INDIVIDUAL DEFENDANTS knew Machicote because of his notoriety as one of the most violent drug dealers within the confines of the 75th Precinct.

68.     Due to their knowledge of Machicote's criminal history and ongoing criminal activity, the INDIVIDUAL DEFENDANTS intentionally did not run his name in their "bad guy" databases to avoid a paper trail that would have to be turned over to prosecutors at the KCDAO and the defense.

69.     Machicote described a scuffle that occurred around 2:30 a.m. that broke up. Then another "beef" started up at the end of the night between Harper and a black male. Machicote said he stepped in to try to calm everyone down. Everyone started pushing and shoving. Then he

saw a black male with braids by the dance floor point a small revolver at them. The black male with braids fired three times and then 2 more times. As soon as the shooting began, Machicote took off running. He ran into a wall, fell, then got up and ran out of the building, into his car and left the location. Later, his wife called to say that her brother "Mel" [Blake Harper] had been shot.

70.     Detectives HUTCHISON and VASQUEZ showed Machicote the suggestive six-photo array with DAVIS's two-year old arrest photo with his hair in cornrows. Upon information and belief, Detectives HUTCHISON and VASQUEZ impermissibly suggested DAVIS as the suspect. Unsurprisingly, Machicote picked DAVIS's photo, which was in position #2, and documented his identification by signing next to photo #2.

71.     At 11:30 p.m., Detectives HUTCHISON and VASQUEZ brought Machicote to the KCDAO at 350 Jay Street to "lock in" his statement by audio recording it in the presence of the "riding ADA."

72.     The NYPD and KCDAO had a policy of having a "riding ADA," who knew nothing about the case or investigation, audio tape "interviews" with witnesses in homicide cases. To ensure that the witness's statement would be consistent with the case that detectives were building against the suspect or defendant, homicide detectives would debrief the "riding ADA" shortly before turning on the audio tape to inform him or her of the facts they desired to be recorded. The witness's statement would then be recorded so he or she would be "locked in" to facts that inculpated the suspect or defendant. If, however, a witness provided exculpatory or favorable information for the suspect or defendant, detectives and "riding ADAs" were instructed and encouraged, by NYPD and KCDAO policy, not to document or record those

statements or interviews. This ensured that only inculpatory evidence was documented in the case file and that *Brady* material would not be documented and disclosed to the defense.

73.     The "riding ADA" on call that night, along with Detectives HUTCHISON and VASQUEZ, audio recorded Machicote's statement and identification.

74.     However, the INDIVIDUAL DEFENDANTS knew that Machicote's photo array identification alone, under the circumstances, was an insufficient basis for initiating Plaintiff's arrest and prosecution.

75.     Detectives HUTCHISON and WHELAN set out to obtain another photo identification from another witness.

76.     On March 1, 2004, Detectives HUTCHISON and WHELAN "re-interviewed" Davis Torres at the 75th Precinct. Torres told the detectives that he only "got a glimpse" of the shooters face and reiterated that he was a light skinned black male, 18 years old, with braids. Detectives HUTCHISON and WHELAN showed Torres the same suggestive photo array they showed Machicote. Torres did <u>not</u> make an identification, but picked DAVIS's photo as someone who resembled the shooter.

77.     Detectives HUTCHISON and WHELAN instructed Torres to sign next to DAVIS's photo so they could falsely claim that he had identified DAVIS from the photo array. Torres, however, refused to sign. In an attempt to manufacture a false identification, Detectives HUTCHISON and WHELAN repeatedly told Torres that the person he selected as "resembling" the shooter was the shooter. Reiterating his refusal to sign the photo array next to DAVIS's photo, Torres responded to the detectives, "if you say that's the shooter, then that's the shooter."

78.     Instead of documenting Torres' refusal to sign the array and his statement that DAVIS only resembled the shooter, Detective HUTCHISON falsely wrote in a DD5 that Torres *identified* DAVIS as the man with the gun.

79.     HUTCHISON's failure to document and disclose to the KCDAO Torres' refusal to sign the photo array and his statement that DAVIS only resembled the shooter was a violation of his *Brady* obligations.

80.     In keeping with the NYPD's and KCDAO's policy of only recording witness statements that inculpated a suspect or defendant, but not those that are favorable or exculpatory, Detectives HUTCHISON and WHELAN did not bring Torres to be interviewed by the "riding ADA" at the KCDAO.

81.     This manufactured identification became part the INDIVIDUAL DEFENDANTS' purported probable cause in support of DAVIS's arrest.

82.     Detective HUTCHISON would later falsely testify at DAVIS's pretrial hearings that Torres positively identified DAVIS from the photo array.

83.     Detectives HUTCHISON and VASQUEZ issued a wanted card for JAMES DAVIS's arrest.

84.     On March 26, 2004 at 7:05 a.m., JAMES DAVIS was arrested at his home pursuant to the wanted card notification that Detectives VASQUEZ and HUTCHISON issued.

85.     The INDIVIDUAL DEFENDANTS failed to seek a judicial arrest warrant for JAMES DAVIS as the United States Constitution requires under the Fourth Amendment.

86.     Detectives HUTCHISON and VASQUEZ knew they did not have probable cause to arrest DAVIS because they manufactured the photo array identifications through suggestive, coercive and false means.

87.     At approximately 11:45 a.m. at the 75th Precinct, DAVIS waived his Miranda rights and gave a statement to Detective HUTCHISON.

88.     DAVIS told HUTCHISON that he heard about the shooting at the club. He had been at the party with his brother, Daniel, three friends he referred to as "B.O.," "Big Man," and Vic, and some other guys from Ocean Hill. He left the party around 2:30 a.m. because he was not feeling well. He took a cab by himself to his girlfriend's house.

89.     At approximately 2:00 p.m., DAVIS made a second statement that included more detail. He told HUTCHISON he was not on the floor much during the party but was in the bathroom smoking "weed." He had brought about 15 bags with him and he and his friends did not want to smoke it on the floor. He drank and smoked so much that he got sick and had to leave. He took a cab to his girlfriend's house at 112 Hancock Street but did not stay there, because he did not get along with her mother. His girlfriend met him outside and they walked to her aunt's house near Brooklyn Avenue and Herkimer Street. DAVIS found out about the shooting the next day, when he went back to his grandmother's house and learned three people had been shot, two of whom he knew.

90.     Unsatisfied with DAVIS's exculpatory statement, Detective HUTCHISON continued to interrogate DAVIS for hours, trying to get him to change his story. Detective HUTCHISON repeatedly tried to convince DAVIS to say that he shot Harper in self-defense, and if he "admitted" to those facts, he would talk to the DA about cutting him a break on the sentence.

91.     DAVIS refused to lie, repeatedly told HUTCHISON that he was not going to say what he wanted him to say, and begged him to speak to his witnesses to verify that he had left the party before the shooting happened.

92.     Detective HUTCHISON never spoke to DAVIS's alibi witnesses, nor did any of the other INDIVIDUAL DEFENDANTS, because they had tunnel vision and were only interested in information that confirmed their belief that DAVIS was the shooter.

93.     Eventually, DAVIS realized that Detective HUTCHISON was not interested in the truth and was only trying to get him to falsely implicate himself. Finally, at 10:45 p.m., after being in police custody for over 15 hours, DAVIS told Detective HUTCHISON that he was finished talking and requested a lawyer.

94.     While DAVIS was at the 75th Precinct being interrogated, Detectives HUTCHISON and EGGERS, under the supervision of Sergeant McCORMACK, were simultaneously arranging to conduct a lineup. HUTCHISON and EGGERS obtained three fillers from the nearby shelter at Atlantic and Van Sinderen Avenues and two fillers from the 75th Precinct. None of the fillers looked like DAVIS.

95.     Upon information and belief, Detective HUTCHISON contacted Jose Machicote and told him that the police had the suspect he had picked out in the photo array in custody and to come to the precinct to view a lineup.

96.     Detective HUTCHISON then contacted Blake Harper's mother, Carrie Goodine, to tell her that they had a suspect that "fit the description" in custody at the precinct and that they were arranging a lineup.

97.     Ms. Goodine called Shawn Belton and another one of her son's friends, Harold Pou, aka "Bernie," and told them that the police had someone "that fit the description" in custody and guilted them to come to her house so she could bring them to the precinct to view the lineup.

98.     Detective HUTCHISON, along with one of the INDIVIDUAL DEFENDANTS, went to Ms. Goodine's home to interview and prime Belton and Pou to view the lineup.

99.     Detective HUTCHISON arranged with Ms. Goodine to bring Belton and Pou to the precinct, which he knew was highly improper and would taint the witnesses's statements and identification.

100.     As instructed by Detective HUTCHISON, Ms. Goodine drove Belton and Pou to the 75th Precinct at 8:00 p.m.

101.     At the precinct, Detective HUTCHISON "re-interviewed" Shawn Belton. He asked Belton why he previously told the police he did not see anything. According to Detective HUTCHISON, Belton replied that he was "concerned for his safety out on the streets but felt that he had to do the right thing at this time for his friend Mel [Blake Harper]." Belton described the shooter as a "light skin male black, about 5-10 [inches] tall wearing a black skully cap."

102.     Upon information and belief, after meeting with Detective HUTCHISON and ADA Chu, Belton changed his description of the shooter from a person wearing a skully cap to a person with braids.

103.     JAMES DAVIS was noted in the arrest paperwork to be 5 feet 8 inches tall and therefore did not match Belton's description of the shooter's height.

104.     While Detective HUTCHISON was re-interviewing Belton, Detective EGGERS interviewed Harold Pou. He described being near the bar/exit at 4:00 a.m. when he saw "Pappa," aka Machicote, in a verbal argument with a light skinned male black with braids and in his 20s. Another male black looking very similar to the male black just described but thinner build, who could have been his brother, brandished a small frame handgun and fired in Mel's direction at least twice. Pou ran out the door. Then minutes later, he called Mel's sister who told him that Mel was DOA.

105.    Harold Pou viewed the lineup at 9:55 p.m. and selected DAVIS who was seated in position #5 as being at the club and shot Mel. Prior to viewing the lineup, the detectives "threw [Pou] a hint," which Pou knew was improper, and told Pou that "sometimes people's appearance may not appear the way you saw them." After the detectives threw him the hint, Pou picked DAVIS out of the lineup because, without the braids, DAVIS was the only one who resembled the shooter.

106.    Upon information and belief, the detectives threw Machicote and Belton similar hints before they viewed the lineup.

107.    At 10:00 p.m. and 10:03 p.m., Belton and Machicote, respectively, identified DAVIS as the shooter who killed Mel.

108.    At 10:05, Detective HUTCHISON formally placed JAMES DAVIS under arrest for murder in the second degree and criminal possession of a weapon in the first degree.

109.    When Detective HUTCHISON placed DAVIS under arrest, he knew that the arrest was not supported by probable cause because he knew that the three identifications had been falsely manufactured by him and the other INDIVIDUAL DEFENDANTS.

110.    After the lineups were completed, HUTCHISON and EGGERS arranged for the "riding ADA" Steven Murphy to "lock in" Belton's and Pou's statements and identifications on audio tape.

111.    Pou stated to ADA Murphy that this was the first time he had spoken to the police. He came forward only because [Blake Harper]'s mother gave me a call and told me they think they have somebody that fit the description. She told me she'd like me to come and verify that was him." When ADA Murphy asked Pou if he saw someone in the lineup, Pou replied,

18

"Yes, I saw similar [sic]." In response to further questioning, as to whether the person he identified was the shooter, Pou replied, "Yes."

112.     Detective HUTCHISON and EGGERS did not inform ADA Murphy about the hints they gave to the three witnesses to get them to identify DAVIS.

**Criminal Prosecution**

113.     On April 1, 2004, JAMES DAVIS was indicted on two counts of second-degree murder (intentional and depraved indifference), criminal possession of a weapon in the second and third degree, and reckless endangerment in the first degree.

114.     The indictment was secured by fraud and bad faith on the part of the NYPD and KCDAO.

The First Trial

115.     DAVIS's first trial began on November 10, 2005. ADA Phyllis Chu was the trial prosecutor. ADA Chu called Pou, Belton, and Machicote to testify.

116.     Upon information and belief, before taking the stand, Harold Pou and Shawn Belton recanted their lineup identification of DAVIS to ADA Chu.

117.     ADA Chu withheld information from Mr. DAVIS, his attorney, the Court, and the jury, that Harold Pou and Shawn Belton recanted their identifications of DAVIS before taking the stand and did not document their recantations.

118.     Upon information and belief, ADA Chu and Detective HUTCHISON used threats and other coercive tactics to force Pou and Belton to testify consistently with the statements they provided to the "riding ADA" Steven Murphy.

119.     Detective HUTCHISON testified about the lineup procedures and withheld information from the KCDAO, the judge, the defense, and the jury about how he and the other

INDIVIDUAL DEFENDANTS manufactured the false identification evidence against JAMES DAVIS.

Kaneen Johnson

120.    DAVIS called his fiancé Kaneen Johnson as a witness. She testified that they had known each other for three years. She recalled the events of January 25, 2004 because she did not want DAVIS to go to the party and they had argued about it. He was going to sell "weed" there; he sold "weed" almost every day. He did not invite her to come to the party.

121.    At around 2:30 a.m., on January 25, 2004, Ms. Johnson received a phone call from DAVIS, who said he was leaving the party and taking a cab to her house on Hancock Street, where she lived with her mother. Johnson recalled DAVIS was "drunk and stupid" when he got out of the cab; he threw up on the street. They then walked to her aunt's house on Herkimer Street and spent the night there. They often stayed in her aunt's second bedroom, because Kaneen's mother did not get along with DAVIS.

122.    Ms. Johnson also testified that in January of 2004, JAMES DAVIS had short hair, not cornrows or braids. He had gotten ringworm in August of 2003, as a result of which he had his head shaved, and took pills and used an ointment on his head. After that, he kept his hair short.

123.    The trial ended in a mistrial on November 23, 2005 after the jury deadlocked at 11 to 1 to acquit.

124.    Instead of re-evaluating their weak case that relied entirely on faulty manufactured identification evidence, and in light of Kaneen Johnson's credible alibi testimony, the KCDAO doubled down and re-tried DAVIS at a second trial.

Second Trial

125.    The retrial began on May 3, 2006.

126.    Jose Machicote identified JAMES DAVIS as the shooter. Machicote had convictions for robbery in the second degree, fourth-degree criminal possession of a weapon, assault in the third degree, and drug sales. He spent several years in prison and was on parole and in violation of his curfew when he attended the party at the Masonic Temple.

127.    Machicote falsely testified at DAVIS trial that he was no longer involved in criminal activity and was making a living as a barber.

128.    ADA Chu, Detective HUTCHISON and the INDIVIDUAL DEFENDANTS knew, or should have known, that at the time of Machicote's testimony at DAVIS's retrial, he was being investigated by a joint FBI and NYPD task force of major drug dealers in Brownsville, Brooklyn. Machicote was in a database of violent criminals and drug dealers, which law enforcement called a "bad guy list." In the Spring of 2006, right around the time of DAVIS's trial, a federal confidential informant made a series of drug buys from Machicote. ADA Chu, Detective HUTCHISON and the INDIVIDUAL DEFENDANTS knew or should have known this information, but intentionally withheld the information from the defense and the Court.

129.    Five months after DAVIS's second trial, Machicote was murdered by a drug dealer named Richard Gilliam on November 13, 2006, when Machicote and some associates tried to rob him. *See United States v. Gilliam, 2011 WL 2113449* (C.A. 2) (Appellate Brief).

130.    Wiretaps also captured one of Machicote's co-conspirators saying that Machicote's wife, LaVonne Harper (Blake Harper's sister) was close enough to the NYPD that she called a Detective Shulman directly to report that Machicote was missing. *See U.S. v. Wesley Robinson*, Criminal Docket No. 10-777 (JG), Dkt #3.

21

131.    Despite knowing that Machicote's testimony about his criminal conduct was false, ADA Chu failed to correct it and failed to disclose the falsity of this information to the defense and the Court, as she was required to do pursuant to *Brady v. Maryland*.

132.    Furthermore, in her summation, ADA Chu falsely and misleadingly argued to the jury that Machicote should be believed because he was a reformed man, a barber, honest about his criminal *past* that he had put behind him, and brave to face Blake Harper's killer in the courtroom.

133.    According to Machicote, during the party, Blake Harper got into an altercation with some other men. Machicote claimed he tried to break it up and someone started shooting. He described the shooter as a man with brown skin, a goatee, and hair braids, which were close to the scalp and ran in a line to the back of his head. Machicote did not recall the shooter wearing a "skully cap," as Shawn Belton had originally described.

134.    Harold Pou refused to testify and told ADA Chu and Detective HUTCHISON that he was unsure of his identification. He told them that he only selected DAVIS because he "resembled" the shooter and that DAVIS was the only one in the lineup who did.

135.    ADA Chu failed to disclose, to the defense or the Court, Pou's statement that he refused to testify because he did not have confidence that DAVIS was the shooter, as she was required under *Brady*.

136.    ADA Chu misrepresented to the Court and defense counsel that Pou was afraid to testify and that if he were called to the stand, he would testify untruthfully. Based on this misrepresentation, the Court and DAVIS's defense counsel agreed to read Pou's testimony from the first trial to the jury.

137.   Pou never told ADA Chu that he was refusing to testify because he was afraid of JAMES DAVIS.

138.   Pou testified at the first trial that he and Blake Harper had been friends for 15 years. He saw Jose Machicote get into an argument with someone at the party. He, Blake Harper and some others joined in. People were arguing and pushing. As they were about to fight, Pou heard shots ring out. He saw, in profile, a light-skinned man with braids shooting towards the door. When asked if he saw the shooter in the courtroom, Pou pointed to JAMES DAVIS and said, "the guy over there resemble him, but I know the guy had braids. Like that's [the] main thing that I really knew about it. He was light skinned with braids, but he resemble him."

139.   Shawn Belton testified at the second trial under a material witness order. Prior to the Court issuing a material witness order, upon information and belief, Belton had told ADA Chu that he was refusing to take the stand and that he could not make an in-court identification because he only caught a glimpse of the shooter, as he had originally told the police.

140.   ADA Chu failed to disclose to the defense and the Court that Belton had recanted his identification of DAVIS, as she was required to under her *Brady* obligations.

141.   Instead, she asked the Court to issue a material witness order, to force Mr. Belton to take the stand, which the Court granted.

142.   Belton testified that he and Harper had been friends for 10 years and that he was the godfather of one of Harper's two children. He was with Harper at the party when an altercation broke out. He saw Harper move towards it. Belton was talking to a girl when he heard shots being fired. He saw "sparks" coming out of a gun.

143.    Belton refused to make an in-court identification and testified that he did not get a good enough look at the shooter to be able to make an identification. He testified, as he had originally told the police when first interviewed, that he had only "glanced" at the shooter.

144.    However, based on ADA Chu's false arguments, the Court permitted her to impeach Belton with his prior identification of DAVIS at the lineup and at the first trial.

145.    ADA Chu did not call David Torres at either of DAVIS's trials because she knew that Torres never identified DAVIS during the March 1, 2004 photo array procedure and she knew that Detective HUTCHISON had lied about it during the pretrial suppression hearings. ADA Chu failed to disclose that information to the defense or the Court as required under *Brady* and purposely suppressed it by not calling Torres as a witness.

146.    By the time of the second trial, Kaneen Johnson and JAMES DAVIS were no longer together. Kaneen refused to come to court and DAVIS's attorney failed to obtain a material witness order.

147.    Without Kaneen Johnson's testimony, the jury did not hear any testimony or evidence corroborating DAVIS's statement to Detective HUTCHISON that he had left the party before the shooting happened.

148.    In her summation, ADA Chu argued that the jury should believe Jose Machicote because he testified "accurately and honestly," that the crimes he committed in the late 1990s were a thing of the past and that he was "not trying to hide from you what he did." She argued that the jury should believe him because he put crime behind him and was now a barber. ADA Chu knew that her arguments could not be further from the truth. Such summation misconduct is the type of misconduct that was rampant, rewarded and encouraged by then-District Attorney Charles Hynes.

149.    ADA Chu conducted further summation misconduct by falsely arguing that Pou and Belton recanted their identifications of JAMES DAVIS because they were afraid to face Blake Harper's killer in the courtroom, when neither witness told her they were afraid. She knew they recanted their identifications because they never got a good look at the shooter and was no longer sure that the person on trial was the person who killed their friend. This summation misconduct violated JAMES DAVIS's constitutional right to a fair trial.

150.    On May 15, 2006, JAMES DAVIS was wrongfully convicted of intentional murder in the second degree and criminal possession of a weapon in the second degree.

151.    On June 2, 2006, he was sentenced to 18 years to life, concurrent with ten years' imprisonment, on the murder and weapons possession counts, respectively.

**DAVIS's Conviction is Reversed and the Indictment Dismissed**

152.    JAMES DAVIS has continued to maintain his innocence since his arrest on March 26, 2004.

153.    The Legal Aid Society's Criminal Appeals Bureau was assigned to represent DAVIS on November 15, 2006. Over the course of over a decade, DAVIS's appellate attorneys found several of the other witnesses – Daniel Davis, Jamel Black, Junior Watkins, Corey Hinds, Ishmael Avent -- who were with DAVIS at the Masonic Temple and knew he had left the party before the shooting occurred. They discovered that Jose Machicote was a notorious and violent drug dealer and robber, which the NYPD, FBI, and KCDAO knew, at the time of Mr. DAVIS's trial. Kaneen Johnson confirmed that her testimony at DAVIS's first trial was the truth. They spoke to Harold Pou who confirmed that he only told the police that DAVIS "resembled" the shooter and that DAVIS was the only one in the lineup who did. They spoke to Shawn Belton

who said that he knew who JAMES DAVIS was at the time of the incident and that DAVIS was not the person who committed the shooting.

154.    Following up on information provided by Jamel Black and Junior Watkins that the real shooter was "Tay" or "Tajy" Hall, DAVIS's appellate attorneys found news reports of a an Ovadiah "Taji" Hall-Ricks who was gunned down while crossing a Brownsville Street on July 28, 2004. An arrest photo of Ovadiah "Taji" Hall obtained from the KCDAO, Conviction Review Unit, closely resembled JAMES DAVIS's appearance in the lineup.

155.    Since Jamel Black told detectives back in 2004 that "Tay" was the shooter, the INDIVIDUAL DEFENDANTS' failure to document that statement, or their intentional destruction or withholding of that statement, was an egregious *Brady* violation that hindered DAVIS's ability properly investigate and present evidence of his innocence at trial.

156.    DAVIS's appellate attorneys presented the new evidence at a CPL 440.10 hearing[1] before Judge Daniel Chun in Kings County Supreme Court. Judge Chun denied Mr. DAVIS motion to vacate his conviction, which the Legal Aid Society appealed to the Second Department, Appellate Division.

157.    On April 21, 2021, the Appellate Division reversed Judge Chun's decision denying DAVIS's CPL 440.10 motion on the grounds that DAVIS's trial attorney was ineffective for failing to investigate and speak to his alibi witnesses and for not securing the testimony of Kaneen Johnson at his second trial. Mr. DAVIS's conviction was vacated and a new trial ordered.

---

[1] Appellate counsel's request to call FBI Agent Jed Salter, who had information regarding Jose Machicote's criminal conduct at the time of his testimony at DAVIS's trial and information regarding the "bad guy list" that he was on and was available to the 75th Precinct detectives and ADA Chu, but Judge Chun did not permit the evidence to be presented at the hearing. As a result, the Appellate Division did not have the benefit of that evidence in the record when deciding DAVIS appeal.

158.     On or about May 10, 2021, the KCDAO consented to Mr. DAVIS's release. After more than 17 years, JAMES DAVIS was finally free.

159.     On August 3, 2021, the KCDAO moved to dismiss the indictment, which was granted by Supreme Court Justice Matthew Demic.

C.     **Plaintiff's Damages and Injuries**

160.     As a direct and proximate consequence of the aforementioned events, Plaintiff suffered more than 17 years of imprisonment.

161.     During his incarceration, Plaintiff suffered abusive treatment and harassment by correction officers, sustained physical injuries, and inadequate medical treatment.

162.     Plaintiff also suffered severe emotional and mental anguish and pain as a result of being punished for crimes he did not commit, harassment by correction officers, and dehumanizing treatment by prison staff.  He suffered from lack of privacy, humiliation, harsh prison conditions, and feared he would die in prison.  He was denied adequate treatment for his emotional injuries while incarcerated and continues to suffer mental and emotional anguish to this day.

163.     Plaintiff was also denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, his family members including his then-fiance, his wife, his infant son, his grandmother, brother, uncles, aunts, cousins, and friends. In Plaintiff's eighth year of incarceration, his brother Daniel was shot and killed. Plaintiff suffered immense anguish and fell into a deep depression when he learned the news of his brother's death. He felt angry and helpless that he could not protect his brother while being locked up in prison and blamed himself for his brother's death. Plaintiff missed raising and spending time with this son and did not have a relationship with him until he was 16 years old, after Plaintiff was released from prison.  Even

now his relationship with his son is strained because of the years he could not be a father to him. He cried and felt depressed on every major milestone and holiday that he missed spending with his son, wife and extended family. He worried that his elderly grandmother would die while he was still incarcerated. He worried daily about her health and well-being and felt guilty for not being able to help take care of her.

164.    Plaintiff was denied years of gainful employment and income.  His incarceration interrupted and arrested his employment, seniority and career advancement. When Plaintiff was arrested, he had a budding music career which was cut short. Since being released, he has tried to restart his music career, but his efforts have not been successful.

165.    Plaintiff was unable to provide support for his son financially and unable to be there for him physically and emotionally while Plaintiff was incarcerated, which caused Plaintiff to suffer further mental and emotional stress and anguish.

166.    Plaintiff has been publicly shamed, disgraced, ridiculed, and humiliated.  He was called a murderer by inmates and correction guards every day while he was incarcerated. Nothing can undo the reputational damage Plaintiff has sustained.

167.    Plaintiff was harassed, humiliated, and assaulted by guards and inmates in New York City and New York State Correctional Facilities. He was denied adequate medical care and suffered numerous physical ailments from the unsanitary conditions in prison, poor medical care, and poor nutrition. He was placed in brutal, inhumane conditions, and sent to solitary confinement for the smallest infractions. Plaintiff was exposed to toxic chemical agents on a regular basis by guards. As a result of his ordeal, Plaintiff suffers from anxiety, hypervigilance, nightmares, and depression; conditions that will likely be permanent.

168.     Plaintiff was denied fundamental constitutional rights, his liberty, and has lost his faith in the American justice system.

## FIRST CAUSE OF ACTION
### (42 U.S.C. §1983, Malicious Prosecution Under the Fourth, Fifth, and Fourteenth Amendments; Against INDIVIDUAL DEFENDANTS)

169.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

170.     By virtue of the foregoing, the INDIVIDUAL DEFENDANTS are liable to Plaintiff for damages, pursuant to 42 U.S.C. §1983, for knowingly, willfully, and maliciously causing Plaintiff to be seized, prosecuted, and deprived of his liberty without probable cause, in violation of his right to be free of unreasonable search and seizure pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, and to procedural due process pursuant to the Fifth and Fourteenth Amendments.

171.     The INDIVIDUAL DEFENDANTS are also liable to Plaintiff under 42 U.S.C. §1983 for knowingly, willfully, and maliciously depriving Plaintiff of his liberty, without probable cause, through outrageous conduct that shocks the conscience, in violation of Plaintiff's right to substantive due process pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION
### (42 U.S.C. §1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; Against INDIVIDUAL DEFENDANTS)

172.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

173.     The INDIVIDUAL DEFENDANTS deliberately manufactured false evidence against Plaintiff.

174.    The INDIVIDUAL DEFENDANTS handed the manufactured false evidence to prosecutors and deliberately withheld evidence that was favorable to Plaintiff.

175.    The INDIVIDUAL DEFENDANTS did so knowing that such evidence was likely to be relied upon by the jury at trial, and in fact the evidence was relied upon by the jury, thereby proximately causing Plaintiff's conviction.

176.    In addition, the INDIVIDUAL DEFENDANTS did so knowing such evidence was likely to be relied upon by the court that was responsible for setting or denying bail, by the prosecutor who decided whether to prosecute, and by the grand jury that decided whether to indict, and in fact the evidence was relied upon by these bodies, thereby proximately causing Plaintiff to be deprived of his liberty and prosecuted despite there being no probable cause to prosecute.

177.    Further, the INDIVIDUAL DEFENDANTS, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the due process and fair trial provisions of the Fifth, Sixth, and Fourteenth Amendments, had an absolute constitutional obligation to disclose to the prosecution, and to the defense, all evidence and information in their possession or knowledge which tended to favor Plaintiff, including, but not limited to, the manner in which they had manufactured witnesses' false statements, identifications and testimony.

178.    They knowingly, willfully, intentionally, recklessly, and/or negligently failed to disclose such evidence and information.

179.    The INDIVIDUAL DEFENDANTS thereby violated Plaintiff's right to procedural and substantive due process and to a fair trial pursuant to the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution, and are liable to Plaintiff for damages under 42 U.S.C. 1983.

### THIRD CAUSE OF ACTION
**(Malicious Prosecution Under State Law; Against All Defendants)**

180.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

181.    By virtue of the foregoing, the INDIVIDUAL DEFENDANTS, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

182.    The criminal proceedings terminated in Plaintiff's favor.

183.    There was no probable cause for the commencement or the continuation of the criminal proceedings.

184.    The Defendants acted with actual malice.

185.    Defendant CITY OF NEW YORK is liable under the principle of *respondeat superior*.

### FOURTH CAUSE OF ACTION
**(Monell/42 U.S.C. 1983 Claim; Against Defendant CITY OF NEW YORK;
Kings County District Attorney)**

186.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

187.    At the time of Plaintiff's arrest and prosecution, Charles J. Hynes was the Kings County District Attorney.

188.    Hynes, who was the Kings County District Attorney from 1990 to 2013, campaigned on a "get tough on crime" platform and instituted a series of no holds barred, anything goes, scorched earth policies. The policies were aimed at winning convictions at any

31

cost including by suppressing *Brady* evidence and using false testimony, coercing witnesses to provide testimony the office desired irrespective of its truth or falsity, and making false, improper, and misleading arguments to judges and juries during pretrial hearings and summations.

189.    During the entirety of Hynes' time in office, including the time of Blake Harper's murder investigation and DAVIS's arrest, prosecution and conviction, Hynes maintained affirmative or *de* facto office-wide unconstitutional policies, customs, and practices that evinced deliberate indifference to the constitutional rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, of defendants who were investigated, arrested, or prosecuted by the office, including:

(a)    Refraining from making a record of false or inconsistent out-of-court statements of prosecution witnesses in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as *Brady* material. Indeed, under the KCDAO's "riding" program, prosecutors were permitted and encouraged to make a record of statements that tended to inculpate a suspect or defendant, while ignoring statements that were inconsistent with their belief about the suspect or defendant's guilt, or the office's narrative of the case;

(b)    The improper manipulation of witnesses, and creation of false or inherently unreliable testimony through physical and psychological coercion, threats, unlawful detentions, and promises of rewards;

(c)    The toleration of police and detectives who used such practices, especially those handling homicide and other high-profile cases;

(d)    Withholding prosecution witnesses' pretrial recantations if the prosecutors disbelieved, or at least claimed to disbelieve the recantations, a blatant violation of *Brady* which requires any objectively favorable information to be disclosed to the defense;

(e)    The withholding from criminal defendants favorable *Brady* evidence, including the KCDAO's abuse of process to secure testimonial evidence;

(f)    The knowing or reckless use of, reliance on, and failure to correct false or misleading evidence and argument;

(g)     Making false, improper, and misleading arguments to judges and juries during pretrial hearings and summations.

190.     The unconstitutional practices identified above were followed by ADA Phyllis Chu and other prosecutors in the office and directly caused DAVIS's constitutional injuries.

191.     The existence of Hynes' policies of suppressing *Brady* material, knowingly using false or misleading evidence and argument, and improper summation is established by:

(a)     Multitudes of court decisions finding that prosecutors violated *Brady*, knowingly used false or misleading evidence, and made improper summation arguments;

(b)     Hynes' decision to reward prosecutors who committed such misconduct rather than taking steps to rectify it.

192.     The KCDAO recently admitted that that at the time of DAVIS's trial in 2005, the use of false evidence and suppression of *Brady* material were institutional failures of the Hynes administration, and resulted in at least 25 wrongful convictions. *See* Kings County District Attorney's Office, 426 Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York, July 9, 2020, p. 14 ("Taken together, the wrongful convictions discussed here all point to failures of the prosecution as an institution – whether through acts of individual prosecutors, collective decisions, or failure to train or guide prosecutors adequately"); p. 60 ("In many of the cases, prosecutors . . . failed to disclose important relevant evidence. And in a number of cases, prosecutors failed to adhere to expectations of candor and diligence, thereby denying the defendants a fair trial").[2]

193.     Hynes' deliberately indifferent failure to investigate, supervise, discipline, and/or rectify his employees' violations of their *Brady* disclosure obligations, not to use false evidence and argument, and not to coerce and manufacture such false testimony, effectively encouraged

---

[2] *See* http://www.brooklynda.org/wp-content/uploads/2020/07/KCDA_CRUReport_v4r3-FINAL.pdf.

those employees to do so, and created an "anything goes" atmosphere that caused such violations to continue, including those in DAVIS's case.

194.     In that regard, Hynes and his top lieutenants, his counsel, Dino Amoroso, his Chief of lnvestigations and former Chief of the Homicide Bureau Michael Vecchione, his Chief Assistant, Amy Feinstein, and numerous other ADAs and supervisors, admitted in sworn depositions in *Collins v. City of New York, et. al.*, 11 CV 766 (FB) (RML) (E.D.N.Y.), *Zahrey v. City of New York*, No. 98 Civ. 4546, 2009 WL 54495 (S.D.N.Y.), and other cases, that Hynes and the KCDAO had no written *Brady* disclosure policy, no formal rules of behavior governing how cases would be prosecuted and when (if ever) discipline for misconduct would be warranted, and no formal disciplinary system for investigating or disciplining prosecutors who violated the rights of criminal defendants.

195.     The KCDA representatives above testified that the KCDAO's informal disciplinary "procedure" was for Hynes himself to review all criticisms or complaints about prosecutors. They testified, under oath, that while dozens of court decisions documenting the misconduct of KCDAO prosecutors were brought to Hynes' attention, Hynes failed to report the offenders to outside attorney disciplinary bodies.

196.     KCDAO's personnel records establish Hynes and his managerial staff invariably gave good evaluations, recommendations, promotions, and pay raises to prosecutors they knew had been alleged or found to have engaged in such misconduct, recommended some of them for judgeships (including Phyllis Chu who is now a judge), and others for awards, and otherwise ratified the misconduct by aggressively defending it even after it was exposed.

197.     When Hynes received letters from the public or public officials praising his prosecutors, Hynes personally wrote to the prosecutors informing them that he had received the

complimentary report, and praised the prosecutors. In contrast, when prosecutors' conduct in their handling of a criminal case was criticized, Hynes ignored it, never investigated it, and never confronted the prosecutor about the alleged behavior.

198. Likewise, while Hynes' complimentary letters would be included in the prosecutors' personnel files, no notation would be made about any of the complaints or evidence of the prosecutors' wrongdoing.

199. When a court explicitly found that a prosecutor committed misconduct, no record was kept in the prosecutor's personnel file of the finding, or in a central file, making it virtually impossible to track repeat offenders or to take a prosecutors' behavior into account before transferring the prosecutor to bureaus where the consequences of such misconduct were at their highest.

200. Despite dozens of court decisions finding prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady, Giglio, Rosario*, or statutorily mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, none of the prosecutors involved were ever disciplined.

201. The KCDAO personnel files of the prosecutors in the 64 cases listed in Exhibit C of the Civil Complaint in *Cooper v. The City of New York, et al.*, 21-cv-04171 (ENV)(SJB) (Dkt#5), incorporated herein by reference, where prosecutorial misconduct was found from between 1989 through 2010 reveal no documentary evidence of disciplinary action ever being taken against the prosecutors, no notations of their misconduct, and Hynes conceded in deposition testimony in the Jabbar Collins case that he took no remedial action with respect to such conduct.

202.    Moreover, prosecutors who courts found to have committed misconduct were placed in supervisory and training positions over new ADAs, essentially ensuring that improper practices would be repeated.

203.    Despite the 64 judicial findings of misconduct, ¶201, *supra*, not once during Hynes' 24 years in office did he ever terminate a prosecutor for prosecutorial misconduct.

204.    Against this backdrop of the lack of a disciplinary infrastructure, Hynes kept win/loss statistics, making a prosecutor's conviction rate a key factor in his or her ability to advance their careers within the office.

205.    The above policies, customs, and practices, collectively referred to as "The Hynes Trial Policies," caused DAVIS's wrongful arrest, prosecution, and conviction.

206.    The Hynes Trial Policies individually and collectively, caused, permitted, encouraged, or acquiesced in the commission of, constitutional violations of the rights of suspects and defendants by prosecutors, detective investigators, and NYPD detectives working with the KCDAO, and substantially caused ADA Chu's misconduct at DAVIS's trial and the violation of DAVIS's constitutional rights.

207.    The foregoing violations of DAVIS's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the CITY, amounting to affirmative policies, practices, and customs, and deliberate indifference to the constitutional rights of persons subject to prosecution by the KCDAO, and:

    (a)    the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

        i.    the duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings, including bail hearings, pretrial hearings, and trial;

    ii.    the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means;

    iii.    the continuing duty to obtain, to preserve, and to make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information;

    iv.    the duty to refrain from abusing court process or otherwise coercing or manufacturing false or inherently unreliable statements and testimony from witnesses;

    v.    the duty to refrain from making improper and false arguments in summation; and

(b)    the failure to adequately investigate, instruct, supervise and discipline their employees with respect to such matters, or to rectify such practices.

208.    The aforesaid affirmative or de facto policies, procedures, regulations, practices and/or customs were implemented or tolerated by policymaking officials for the CITY, including, but not limited to, Hynes and his delegates, who knew:

(a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)    that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

(c)    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

209.    The aforementioned policymaking officials had the knowledge alleged in the

preceding paragraph, based upon, among other circumstances:

(a)    as noted above, numerous credible allegations, many substantiated by judicial decisions, that ADAs had wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under Brady, had presented or failed to correct false or misleading testimony and argument, and/or had used improper summation arguments,

(b)    civil lawsuits, some of which resulted in substantial civil settlements, alleging that police and/or ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of crime; and

(c)    numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, recognizing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors to comply with that rule;

(d)    judicial decisions putting the KCDAO on notice that the CITY could be held liable for its failure to adequately investigate, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process or coerce false or unreliable statements and testimony, *see, e.g., Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dep't 2001), *Leka v. City of New York*, 04 CV 8784 (DAB); *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DCP); *Collins v. City of New York*, 11 CV 766 (FB) (RML).

210.    Despite this knowledge, the supervisory and policymaking officers and officials of the CITY perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, did not effectively instruct, investigate or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, as described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the CITY and the State of New York.

211.    The aforesaid policies, procedures, regulations, practices and/or customs of the

CITY were collectively and individually a substantial factor in bringing about the violations of DAVIS's rights under the Constitution and Laws of the United States and in causing his damages.

212.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of Kings County (or his authorized delegates) had final managerial responsibility for instructing supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to abuse judicial process, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

213.    Hynes, who was the highest-ranking New York City official with responsibility for setting and enforcing policy with respect to managing his office's personnel and the functions of the office, had final policymaking authority in all such areas.

214.    Hynes, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his office's performance of its duties.

215.    Hynes at all relevant times was an elected officer of Kings County, one of the constituent counties of the CITY, and the office was and is funded out of the CITY's budget.

216.    Furthermore, Hynes, as the District Attorney, was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2) and federal *Monell* jurisprudence, *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019); and New York

has provided by statute (N.Y. County Law§§ 53, 941) that the CITY's constituent counties (including Kings County), and hence the CITY itself, shall be liable for torts committed by County officers and employees, such as the District Attorney and his assistants.

217.     Hynes, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

218.     During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to DAVIS, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

219.     By virtue of the foregoing, Defendant CITY OF NEW YORK is liable for having substantially and proximately caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

### FIFTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983: Claim Against the CITY based on
the conduct of the NYPD)

220.     DAVIS repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

221.     The foregoing violations of DAVIS's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the CITY amounting to deliberate indifference to the constitutional rights of persons, including DAVIS who are investigated, arrested, or prosecuted for alleged criminal activities.

222.     Prior to DAVIS's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

(a)     The use of unduly coercive and suggestive interrogation techniques and identification procedures with potential witnesses, including drug users and addicts, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

(b)     The determination of probable cause to make an arrest; and

(c)     The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (*Brady* material) favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witness has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

223.     The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the CITY, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

(a)     To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)     That such issues either present police employees with difficult choices of

41

the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

(c)     That the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

224.    The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of DAVIS's constitutional rights beginning with his false arrest and the initiation of a criminal prosecution against him without probable cause and continuing throughout his criminal proceedings, trial and incarceration. The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, and the need to investigate and supervise officers by, among other circumstances:

(a)     Credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony;

(b)     A multitude of civil lawsuits referenced and incorporated herein in the Civil Complaint of *Cooper v. City of New York*, et al, 21-cv-04171 (ENV)(SJB) (Exhibit E), some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause;

(c)     Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

(d)     Judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp.

749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the CITY could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady, see Walker v. City of New Yor*k, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison,* above;

(e)   Formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the NYC Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

(f)   The inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

225.   Evidence that the NYPD, in 2004, had notice, and policies and customs of, deliberate indifference to police misconduct, including the coercion of false or misleading statements, fabrication of evidence, and withholding information favorable to the defense, is evidenced by The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission"), dated July 7, 1994.

226.   The Mollen Commission report established that:

In the face of th[e] problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out …. Thus, there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training, and recruitment.

For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

Mollen Commission Report, p. 2-3.

227.     The Mollen Commission concluded police perjury and falsification of official

records is probably the most common form of police corruption facing the criminal justice

system:

> Regardless of the motives behind police falsifications, what is particularly troublesome
> about this practice is that it is widely tolerated by corrupt and honest officers alike, as
> well as their supervisors. Corrupt and honest officers told us that their supervisors knew
> or should have known about falsified versions of searches and arrests and never
> questioned them,
>
> …What breeds this tolerance is deep-rooted perception among many officers of all ranks
> within the Department that nothing is really wrong with compromising facts to fight
> crime in the real world. Simply put, despite the devastating consequences of police
> falsifications, there is a persistent belief among many officers that it is necessary and
> justified, even if unlawful. As one dedicated officer put it, police officers often view
> falsification as, to use his words, "doing God's work" – doing whatever it takes to get a
> suspected criminal off the streets. This attitude is so entrenched, especially in high-crime
> precincts, that when investigators confronted one recently arrested officer with evidence
> of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

Mollen Commission Report, p. 36, 40-41.

228.     Since the days of the Mollen Commission, the NYPD has done little to nothing to

rectify its embedded culture that leads to the systematic violation of the constitutional rights of

suspects and defendants.  *Accord* Amended Civil Complaint in *Negron v. City of New York*, 18

CV 6645 (DG) (RLM) (S.D.N.Y.) (Doc. # 1) at ¶¶ 213-373, incorporated herein by reference

(detailing numerous additional instances of police misconduct which provided the NYPD with

notice of its officers' misconduct, and establish the NYPD's policy of acquiescence and

ratification). The NYPD's policy, custom and practice of approval and/or ratification of,

toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional

obligations foreseeably encouraged such violations to continue and was a substantial cause of the

violations of DAVIS's constitutional rights beginning with his false arrest and the initiation of a

criminal prosecution against him without probable cause, and continuing throughout his criminal trial, conviction, and incarceration.

229.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, the use of only truthful evidence, and the disclosure of *Brady* material.

230.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority and constituted a CITY policymaker for whom the CITY is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

231.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to DAVIS, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training, supervision and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects. The aforesaid policies, procedures, regulations, practices and/or customs of the CITY and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by HUTCHISON, VASQUEZ, EGGERS, WHELAN, McCORMACK, JOHN/JANE DOE Detectives and Police Officers ##1-10 of DAVIS's rights under the Constitution and laws of the United States.

232.    By virtue of the foregoing, the CITY is liable for DAVIS's damages.

**SIXTH CAUSE OF ACTION**
**(Negligent Hiring, Training and Supervision Under State Law;**
**Against Defendant CITY OF NEW YORK)**

233.    By virtue of the foregoing, Defendant CITY is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and or/employees employed by the Kings County District Attorney's Office and/or the New York City Police Department with regard to their aforementioned duties.

234.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**JURY DEMAND**

235.    Plaintiff hereby demands trial by jury of all issues properly triable thereby.

**DAMAGES DEMAND**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.      For compensatory damages of not less than $54 million;

b.      For punitive damages against each Individual Defendants of $10 million;

c.      For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. 1988 and to the inherent powers of this Court;

d.      For pre-judgment interest as allowed by law; and

e.      For such other and further relief as this Court may deem proper.

Dated:  New York, New York
         November 1, 2022

                    ROMANO & KUAN, PLLC


              By: _____
                    Julia P. Kuan
                    600 Fifth Avenue, 10th Floor
                    New York, New York 10020
                    (212) 763-5075
                    Email: julia.kuan@romanoandkuan.com